NOTICE

Decision filed 03/01/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 220008-U

NO. 5-22-0008

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Macon County. |
| | ) | |
| v. | ) | No. 20-CF-1294 |
| | ) | |
| THOMAS L. BOONE, | ) | Honorable |
| | ) | James R. Coryell, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Presiding Justice Vaughan and Justice Welch concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The State proved attempt murder beyond a reasonable doubt. The circuit court properly found that the defendant knowingly and voluntarily waived his right to counsel and there were no significant changes in circumstances that required re-admonishments. The defendant did not receive *per se* ineffective assistance of counsel. The defendant forfeited the issue of whether the State made improper remarks during closing argument. The defendant's due process rights were not violated, and no cumulative error occurred to require reversal.

¶ 2    Following a jury trial, the defendant, Thomas L. Boone, was convicted of attempt murder and unlawful possession of a weapon by a felon. The defendant was sentenced to 10 years in the Illinois Department of Corrections (IDOC) for attempt murder with a 25-year firearm enhancement, for a total of 35 years in the IDOC, and 3 years of mandatory supervised release. The defendant was sentenced to 10 years in the IDOC for unlawful possession of a weapon by a felon, which was ordered to run concurrently with the 35-year sentence.

1

¶ 3     The defendant claims that the State failed to prove beyond a reasonable doubt that the defendant had a specific intent to kill; that the circuit court failed to properly admonish the defendant of his right to counsel where the defendant had not knowingly, voluntarily, and intelligently waived his right to counsel; that the defendant received *per se* ineffective assistance of counsel; and that the State made improper remarks during closing arguments. The defendant additionally argues that to uphold the integrity of the judicial system, we should reverse the defendant's convictions and remand for a new trial, or in the alternative, find that cumulative error deprived the defendant of a fair trial. For the following reasons, we affirm.

¶ 4                                                I. BACKGROUND

¶ 5     On September 19, 2020, at approximately 4 p.m., a group of people arrived to fight Paris Jelks at her home.[1] During the confrontation, Paris Jelks was shot three times in the abdomen and taken to the emergency room for treatment. Jelks survived and she identified the defendant as the shooter.

¶ 6     On October 21, 2020, the defendant was charged by information with attempt with the intent to commit first degree murder in violation of section 9-1(a)(1) of the Criminal Code of 2012 (Code) (720 ILCS 5/9-1(a)(1) (West 2020)), aggravated battery with a firearm in violation of section 12-3.05(e)(1) of the Code (720 ILCS 5/12-3.05(e)(1) (West 2020)), unlawful possession of weapons by felon in violation of section 24-1.1(a) of the Code (720 ILCS 5/24-1.1(a) (West 2020)), and aggravated unlawful use of weapon in violation of section 24-1.6(a)(1), (a)(3)(A-5) of the Code (720 ILCS 5/24-1.6(a)(1), (a)(3)(A-5) (West 2020)).

¶ 7     The circuit court initially appointed a public defender to represent the defendant. The defendant subsequently hired private attorneys, Karen Root and Christopher Amero.

_____

[1]The motive for this confrontation is not relevant to the determination in this case.

2

¶ 8    The trial was set for August 16, 2021. On August 13, 2021, during the final pretrial conference, the defendant interrupted the circuit court to state that he had fired his attorneys. The circuit court admonished the defendant to remain silent. The circuit court inquired as to whether the State was ready for trial and the defendant continued to interrupt. The defendant was removed from the courtroom. Defense counsel, Amero, then informed the circuit court that the defendant was "of the impression that the laws of the State of Illinois are not applicable to him, only maritime laws are applicable to him." Amero further stated that the defendant's beliefs, the sovereign citizen movement, was "a pretty big movement." Defense counsel, Root, informed the circuit court that the defendant had not filed a written motion, but he had written numerous letters. The circuit court vacated the August 16, 2021, trial date and continued the matter for a hearing regarding the status of the defendant's attorneys.

¶ 9    The circuit court held a hearing on August 24, 2021, on the defendant's request for waiver of counsel. At the start of the hearing, the defendant interrupted the circuit court and the following transpired:

"THE COURT: [Defendant], we have been through this before.

THE DEFENDANT: I claim common law jurisdiction, and I waive the benefits of the courts.

THE COURT: Let me ask you one question, [Defendant], do you want to terminate your relationship with Mrs.—with Mrs. Root and Mr. Amero? Yes or no?

THE DEFENDANT: I understand *propria persona sui juris*.

THE COURT: Well, I don't even know what that meant. You're obviously a lot smarter than me, [Defendant], but do you want to terminate your relationship with—I'll ask you again, do you want Mrs. Root and Mr. Amero to be your lawyers?

THE DEFENDANT: I don't want anybody representing my person besides myself.

THE COURT: So you're going to represent yourself?

3

THE DEFENDANT: I will be representing my person in all caps.

THE COURT: So, again, I'm going to ask you again, you don't want a lawyer, you don't want me to appoint a lawyer, you don't want to hire a new lawyer; is that correct?

THE DEFENDANT: Exactly.

THE COURT: You're going to represent yourself?

THE DEFENDANT: I will be representing my person in all caps.

THE COURT: So then let's back up a little bit. All right. And you understand, [Defendant], in Count I you're charged with attempt first degree murder, that's a Class X felony. If you're convicted, the minimum sentence is six years. The maximum sentence is 30 years plus if the jury finds that you possessed a gun at the time of the shooting, 25 years gets added to those terms. Meaning the minimum sentence would be 31 years and the maximum sentence would be 55 years. Do you understand the charge there and the potential penalties, [Defendant]?

THE DEFENDANT: I overstand the charges. I'm aware that the alleged charges do not abrogate constitutional law.

THE COURT: Very well. And then count II alleges aggravated battery with a firearm, that's a Class X felony. That means the minimum sentence would be 6 years, the maximum sentence would be 30 years, again, to be followed by a three-years term of mandatory supervised release. Do you understand the charge and the potential penalties as to Count II?

THE DEFENDANT: I overstand.

THE COURT: Then, Count III alleges unlawful possession of a weapon by a felon, that's a non-probational Class II felony, that means the minimum sentence would be three years, the maximum sentence would be 14 years, and that would have to be followed by a one-year term of mandatory supervised release. Do you understand that charge and the potential penalties there, [Defendant]?

THE DEFENDANT: I overstand.

THE COURT: Then, finally Count IV alleges aggravated unlawful use of a weapon, and it alleges you have a prior conviction, again, that's a non-probationable Class II felony. That means the minimum sentence would be three years, and the maximum sentence, I believe, would also be 14 years to be followed by a one-year term of mandatory supervised release. Do you understand that charge and the potential penalties there, [Defendant]?

THE DEFENDANT: I overstand.

4

THE COURT: Okay. And you understand if you're indigent, meaning if you don't have any income at this time or any assets, I'll be happy to appoint the public defender to represent you. Do you understand that?

THE DEFENDANT: I overstand.

THE COURT: Okay. And you understand I'd also give you the opportunity to hire, again, your own lawyer. Do you understand those things, [Defendant]?

THE DEFENDANT: I overstand.

THE COURT: Okay. And knowing everything I just explained, the charges, the potential penalties, your constitutional right to be represented by a lawyer, you're telling me you want to represent yourself at this time; is that correct?

THE DEFENDANT: I would like to represent my person in all caps.

THE COURT: So very well."

¶ 10    The circuit court found that the defendant knowingly, voluntarily, and intelligently after being admonished, waived his right to counsel. The circuit court attempted to ascertain whether the defendant was ready for trial. The defendant then claimed that he did not "consent to any proceeding of the court," and stated that if the State "doesn't do his job, that's tyranny which also leads to genocide. The penalty could be death." The circuit court found that the defendant refused to answer whether he was ready to proceed with trial. The defendant continued to interrupt the circuit court and he was removed from the court room. The circuit court then, own its own motion, set the jury trial on October 18, 2021.

¶ 11    On September 3, 2021, a special appearance of "Sharon-Renee-Lloyd: Al" as the "specific Power of Attorney-in-Fact" for the defendant was filed. The special appearance filing stated that the defendant terminated all representatives. Additionally, documents entitled, "Filing Copies of Authenticated Certificate of Live Birth, GSA's, Department of the Treasury Internal Revenue Service OMB Forms with 3949A Communication with Letter of Direction," and a document entitled, "Release of Personal Property from Escrow," and an affidavit of individual surety, a bid

bond, a performance bond, a payment bond, and a form 1099-OID were filed. A copy of the defendant's birth certificate was filed on October 13, 2021.

¶ 12    During a status conference on October 15, 2021, the circuit court inquired whether the parties were ready for trial. The defendant read a statement where he claimed that he was not the defendant and he was "the beneficiary of the trust which is being molested at this time without my consent," and he was "standing *in propria persona sui juris*." The defendant did not answer if he was ready to proceed with trial. The circuit court, on its own motion, reset the jury trial for November 15, 2021.

¶ 13    On November 15, 2021, the defendant appeared before Judge Thomas E. Griffith to determine whether the case was ready for trial. The State informed the circuit court that it was ready to proceed. The defendant then stated:

> "Let the record reflect that I am not the state in question. I'm the beneficiary of the trust. With all due respect administrator I've stated multiple times, for the record, that I do not consent to trial.
>
> The general service administrative guidance documents according to the executive order 13892, which are the bonds and release forms, are with the Clerk and the book entry shall reflect this fact. I would like to know what's taking the Court to balance the bonds?"

The circuit court found that the defendant would not respond as to whether or not he was ready for trial, and the jury trial would proceed. The jury trial was assigned to Judge Coryell.

¶ 14    The jury trial began on November 15, 2021, before Judge Coryell. The circuit court informed the defendant that he had the right to sever two counts which involved prior convictions, or the defendant could stipulate to his prior convictions. The circuit court asked the defendant if he understood his options and the defendant said, "No, I don't understand." The circuit court then paused the proceedings to address another matter. When the case resumed, the circuit court stated the charges and again explained that the defendant could sever the unlawful possession of a

6

weapon by a felon and the aggravated unlawful use of weapon from the attempt and aggravated battery charges. The circuit court asked if the defendant understood and the following transpired:

"THE DEFENDANT: No, I don't understand.

THE COURT: What don't you understand about it?

THE DEFENDANT: That's not—but it's the nature and the Sixth Amendment to the Constitution give me the right to ask the Court to explain any nature—the nature and cause of any action against me and upon my request the Court has the duty to answer.

THE COURT: Which amendment is this?

THE DEFENDANT: The Sixth Amendment.

THE COURT: To which constitution?

THE DEFENDANT: The Constitution of the United States.

THE COURT: Okay. Well, my copy doesn't have that in there about admonishing you about that. I'm telling you that you have those allegations, and you have a right to have those counts severed from the first two counts and have them tried separately if you'd like. If you want a separate trial on those two counts, I will give it to you. Do you want a separate trial?
THE DEFENDANT: I don't understand the nature and cause of this action, administrator, so I would like to exercise the Sixth Amendment of the Constitution, if you may.
THE COURT: Okay. Well, I'm going to show then there's no motion to sever the counts. Then, the next issue is whether or not you want to stipulate to the conviction. You have a right to make the State prove the prior conviction or you can stipulate merely that you were—that you have the conviction without the details coming in. Do you want to stipulate or do you want to make the same argument?

THE DEFENDANT: I don't understand.

THE COURT: What don't you understand?

THE DEFENDANT: The nature and cause of this action.

THE COURT: Okay. Then I'm going to show the defendant declines to stipulate. Next, we're getting into the—is there anything to go over with him, [State], on the preflight as far as any offers made or anything of that nature?

THE STATE: Your Honor, he—when he had counsel, which was Mrs. Root, an offer was relayed to her of a plea to Count II for a 12-years D.O.C. sentence. I do not know

7

whether that was relayed to him. Since he has been *pro se*, no offers have been made nor have any been requested.

THE COURT: Okay. [Defendant], did you understand what he just said?

THE DEFENDANT: No.

THE COURT: Okay. When you were represented by a lawyer, the State made an offer of a 12-year sentence if you entered a guilty plea on the second count of the Information, which accuses you of aggravated battery with a firearm. That charge is a Class X felony punishable by a term in the Department of Corrections from 3 to—or from 6 to 30 years. You must serve 85 percent of the sentence.

And what is the parole period on that? It changed.

THE STATE: It did. I think it's still three years though on a Class X.

THE COURT: Three years parole. Okay. In exchange if you do that, the State would dismiss Count I, which is a charge of attempt first degree murder with an enhancement with a firearm. If you're convicted of first degree murder, the penalty is the same, must be served at 85 percent, and there's also a mandatory 25-year add-on so that your minimum is 31 years. The third count is a 3 to 14-year possible sentence with a, what, two-year parole period?

THE STATE: Yes.

THE COURT: And the fourth count is a, again, a Class II offense with a 3 to 14-year minimum or 3 to 7-year minimum, I guess, with a two-year parole period. Do you understand the offer that was made to you?

THE DEFENDANT: I don't understand, administrator, because I had filed with your clerk of the court office a copy of the authenticator certificate of live birth which trust was created, the GSA bonds, the GSA affidavit of individual surety, and GSA release forms for the private property. Pursuant to Title 28 USC Section 1738—

THE COURT: Thank you. That has nothing to do with what we're talking about, but that's fine if that's what you want to talk about.

So I'm going to show there's no indication of any interest in the offer. We're now going on to the jury selection process ***."

¶ 15 Before the jury was selected, the State moved to dismiss count IV, aggravated unlawful use of weapon, without prejudice. Count IV was dismissed. During jury selection, the circuit court addressed the defendant multiple times regarding any challenges for the prospective jurors. The

8

defendant repeatedly responded, "I am not the estate in question. I am the beneficiary of a trust that is being molested at this time without my consent."

¶ 16    The parties presented opening statements. The defendant again stated, "I am not the estate in question. I am the beneficiary of a trust that is being molested at this time without my consent." The defendant additionally referred to bonds that were filed with the circuit clerk and stated that he wanted to settle and close out the trust. He also claimed that the circuit court was committing a conspiracy against his rights and referred to being incarcerated as a "genocide," which is "treason."

¶ 17    Paris Jelks testified that Dymond Gant was her roommate, and Jelks had asked Gant to move out on September 19, 2020. Gant left and returned to Jelks's house with a "crowd" of people, presumably to help her move belongings. Jelks testified that she had a "crowd" on her side as well, including her siblings, her mother, and some friends. Jelks testified, "it as [*sic*] a lot of ruckus like it was going—a fight was going to break out." Jelks was standing in the doorway of her front porch, arguing with the crowd of people. Jelks heard the defendant say, "Can we talk to him?" At that time, Jelks believed that the defendant was trying to stop the arguing because he had asked to talk. Jelks did not talk to the defendant. Approximately 10 minutes later, the defendant drew his gun and fired. Jelks testified that she did not realize that the defendant was shooting the gun until she was hit by the first bullet. Jelks was shot multiple times.

¶ 18    Jelks additionally testified that she was taken to the hospital for treatment. While she was hospitalized, a detective interviewed Jelks. Jelks viewed a video lineup and identified the defendant by his nickname, "Tay," in the lineup. Jelks additionally identified the defendant in the courtroom as the person who had shot her.

¶ 19    The circuit court asked the defendant if he had questions for Jelks. The defendant stated, "I am not the estate in question. I'm the beneficiary of a trust that is being molested at this time."

9

¶ 20    Lisa Lewis testified that Paris Jelks was her daughter. On September 19, 2020, Lewis went to Jelks's house after Jelks had called to tell Lewis that someone wanted to fight Jelks. When Lewis arrived, there were two cars blocking the driveway and approximately eight people on Jelks's property. Lewis saw a woman swinging a metal baseball bat. Lewis confronted her and they fought over the bat. Someone from the crowd had to separate Lewis and the girl with the bat. Lewis then joined Jelks on the porch. Gunshots were fired. Lewis testified that she saw the person who fired the gun and identified the defendant as the shooter. After Lewis saw the defendant fire the gun, Jelks fell down because she had been shot.

¶ 21    Bryan Kaylor, a police officer with the Decatur Police Department, testified that he investigated the shooting. Kaylor visited Jelks at St. John's Hospital in Springfield, Illinois, two days after the shooting. Jelks provided Kaylor with the shooter's nickname, a portion of the defendant's birthdate, and a description. Kaylor testified that based on the information provided, a lineup was created that included a photograph of the defendant. Jelks was shown the lineup through an independent administrator, Detective Jason Danner. Jelks had identified the defendant as the shooter from the lineup.

¶ 22    Jason Danner testified that he was the detective with the Decatur Police Department that administered the photo lineup. Danner was not involved in the investigation. Jelks had to use a keyboard from her hospital bed due to her condition to respond to Danner's lineup questions. Jelks was able to identify the shooter from the lineup and indicated that she was 100 percent certain that the photograph identified the shooter.

¶ 23    Warlali Nutakor, a physician at St. Mary's Hospital in Decatur, Illinois, testified that he treated Jelks' gunshot wounds to the abdomen. An x-ray was performed on Jelks, and Dr. Nutakor identified three gunshot wounds and bullets. After Jelks was stabilized, she was transferred to St.

John's Hospital in Springfield, Illinois. Jelks received a blood transfusion while she was being transported to St. John's Hospital. Dr. Nutakor testified that Jelks's injuries were life-threatening.

¶ 24     After Dr. Nutakor testified, the State moved to admit Exhibit 1, a printout of the lineup, Exhibit 2, a DVD containing the video from the electronic lineup, and Exhibit 3, a certified judgment of the defendant's conviction for the offense of unlawful possession of weapons by a felon in People v. Boone, No. 14-CF-920 (Cir. Ct. Macon County, Oct. 17, 2014). The State's exhibits were admitted into evidence and the State rested.

¶ 25     The defendant was given an opportunity to present his case. The defendant stated:

> "I am proper spelling, capital T lower case h-o-m-a-s hyphen capital L lower case e-n-a-r-d colon capital B lower case o-o-n-e hyphen capital J lower case u-n-i-o-r, and I am standing *in propria persona suri juris*. I am here to accept the charges, settle them with the guidance documents and close all open accounts, claims cases in the corporate person name you have mentioned as the defendant.
>
> I orally rescind all signatures you may have from me on any contract in this matter now that I am aware that I hold full faith and credit in all courts. I have here with me today a copy of the authenticator certificate of live birth proving that I hold full faith and credit in this matter in all courts pursuant to Title 28 USC 1738. I also have with me the General Service Administrative OMB Guidance Documents according to the Executive Order 13892, which are the bonds and release forms that were filed with your clerk."

¶ 26     The defendant offered five exhibits into evidence that the circuit court referred to as "a certified copy of a birth certificate," "release of personal property from escrow," "assorted other documents," "notice of filing of authenticated certificate of birth, GSA's, et cetera," "a special appearance by Sharon Renee Lloyd," and "filing copies." The circuit court refused the exhibits and indicated that the exhibits were made part of the record. The defendant did not present any witnesses and stated that he was not going to testify.

¶ 27     Outside of the presence of the jury, the circuit court instructed the defendant that the issue of jurisdiction had already been decided and a closing argument is limited to arguments about the facts of the case based on evidence presented. The defendant then asked how the court had

11

jurisdiction after the defendant had "filed the copy of my authenticator certificate proving that I hold full faith and credit in the corporate name you have mentioned as the defendant." The circuit court responded that it did not understand what the defendant was claiming. The defendant stated, "ignorance of the law is no excuse."

¶ 28    The State presented its closing argument. During its argument, the State stated:

> "This is the closing arguments. This is my chance to talk about the evidence we've heard and argue reasonable inferences that I think can be drawn from that evidence. I will start by saying it's probably reasonable to infer that [the defendant] did not shoot Paris Jelks because he was just so mad about Dyamond Gant being kicked out of Paris' house. That was just the catalyst that resulted in two antagonistic groups of people gathering together.
>
> What their prior antagonisms were we don't know, but clearly they were there when two car loads of people show up and have bats and there's fighting. And on top of that, we have this defendant carrying a gun illegally who based on what he said today does not believe the law applies to him, and that these courts do not have jurisdiction on him."

¶ 29    During the defendant's closing argument, he attempted to make a jurisdiction argument. The circuit court interrupted his argument and instructed the defendant to argue about the facts of the case. The defendant then stated, "I'm not here to argue statutory law or case law. I'm here to complete a transaction." The circuit court then stopped the defendant's closing argument.

¶ 30    The circuit court instructed the jury that it was their duty to determine the facts and make their determination from the evidence in this case. The jury instructions included that the closing arguments were made to discuss the facts and circumstances in the case. The jury was instructed to draw reasonable inferences from the evidence and that any statement or argument made that was not based on evidence should be disregarded.

¶ 31    The jury asked the circuit court the following questions while deliberating:

> "How many times total was the weapon fired? Was the weapon a handgun or a long gun? What time of day and weather conditions? Can we get evidence showing that the defendant, in fact, has a felony, Exhibit 3?"

12

The circuit court provided the following response to the jury:

> "You must rely on your recollection of the evidence. People's Exhibit No. 3 is a certified conviction indicates [the defendant] was convicted of unlawful possession of weapons by a felon on October 16, 2014."

¶ 32    The jury found the defendant guilty of unlawful possession of a weapon by a felon; guilty of attempt first degree murder; guilty of aggravated battery with a firearm; and the jury found that during the commission of attempt first degree murder, the defendant personally discharged a firearm that proximately caused great bodily harm to another person.

¶ 33    The circuit court held a hearing on December 21, 2021, and addressed a notice of filing treason and genocide complaint made by Sharon-Renee-Lloyd: Al. The circuit court found that Sharon-Renee-Lloyd: Al was not a licensed attorney in Illinois according to the ARDC and refused to consider her filings. The circuit court then asked the defendant if he still wanted to continue to represent himself or if he wanted a lawyer. The defendant responded, "For the record and let the record reflect, I claim common law jurisdiction and I waive all benefits of court." The circuit court did not appoint an attorney or inquire further.

¶ 34    The circuit court proceeded with the sentencing hearing. The defendant had refused to be interviewed for the presentence investigation (PSI). The PSI indicated that the defendant maintained that "the Court has no authority to convict, and the involved lawyers, etc. are committing treason and genocide." The circuit court addressed the PSI and the defendant stated that he was an "American state citizen" and it was false to refer to him as a "United States citizen." The defendant also questioned "who or what are you addressing when you say Mr. Boone" in regard to the PSI. The circuit court responded that it was referring to "the person seated in the courtroom here in the jail uniform at the table."

13

¶ 35    The State did not present evidence in aggravation. The defendant did not present evidence in mitigation. The defendant presented a statement in allocution and stated that he was "here to accept the charges, settle them with the guidance documents, and close all open accounts/claims/cases in the corporate person named you have mentioned as the defendant." The defendant additionally claimed that the crimes were commercial, and he had filed bonds to settle the matter. He additionally, did not "consent to being prosecuted in any foreign jurisdiction of the law."

¶ 36    The State presented its position on sentencing. The State recommended a 25-year sentence with an additional 25-year enhancement for count I, and a 14-year sentence for count III, which would be served concurrently.

¶ 37    The defendant's response to the State's recommendation included:

> "Sharon is my specific power of attorney. She filed on my behalf. I am the only one that is speaking on behalf of my person in all caps. And I am aware that pursuant to Title 18 USC, Section 4109 I have a right to counsel, and she's able to file on my behalf due to the fact that I am incarcerated. I am here under duress, coercion, and threat of imprisonment as I am now, and I've stated multiple times that this case is to be settled and closed with a *nolle prosequi* order. My administrative remedy has been entered."

¶ 38    The circuit court found that count II, aggravated battery, was vacated as it merged with count I, attempt first degree murder. On count I, the defendant was sentenced to 10 years in the IDOC with a 25-year add-on for a total of 35 years to be served at 85% with 3 years of mandatory supervised release. The defendant received a 10-year sentence on count III, the possession of firearms by a felon, served concurrently.

¶ 39    On January 4, 2022, the defendant filed a motion to appeal and claimed that he was "misled to believe that an outside source was helping his case which led to frivolous filings with clerk of the court and no defense to prove innocense [*sic*]." A notice of appeal along with a second motion to appeal were filed on January 7, 2022. In the defendant's motion to appeal he requested a "chance

14

to prove his innocense [*sic*]." The defendant again claimed that he was misled by an "outside source" and the State failed to prove that the defendant had the "intent to kill." This appeal followed.

¶ 40                                    II. ANALYSIS

¶ 41    On appeal, the defendant argues that the State failed to prove beyond a reasonable doubt that the defendant had a specific intent to kill; the circuit court failed to properly admonish the defendant and ensure that the defendant knowingly, voluntarily, and intelligently waived his right to counsel; the defendant received *per se* ineffective assistance of counsel; and the State committed misconduct during closing arguments. The defendant additionally argued that his conviction should be remanded for a new trial to uphold the integrity of the judicial system and that cumulative error deprived the defendant of a fair trial.

¶ 42                          A. Sufficiency of the Evidence

¶ 43    In reviewing a case for the sufficiency of the evidence, "a reviewing court, considering all of the evidence in the light most favorable to the prosecution, must determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime." *People v. Brown*, 2013 IL 114196, ¶ 48. "The trier of fact determines the credibility of the witnesses, decides what weight to give their testimony, resolves conflicts in the evidence, and draws reasonable inferences from that evidence." *People v. Swenson*, 2020 IL 124688, ¶ 36. A reviewing court will not substitute its judgment for that of the trier of fact or retry the defendant. *People v. McLaurin*, 2020 IL 124563, ¶ 22.

¶ 44    To sustain a conviction for attempt murder, the State must establish beyond a reasonable doubt that the defendant "performed an act constituting a substantial step toward the commission of murder," and "possessed the criminal intent to kill the victim." *People v. Viramontes*, 2017 IL

15

App (1st) 142085, ¶ 52. Specific intent to kill is rarely proven through direct evidence and may be inferred from the circumstances, including the character of the assault and the use of a deadly weapon. *Viramontes*, 2017 IL App (1st) 142085, ¶ 52. A deadly weapon is "an instrument that is used or may be used for the purpose of an offense and is capable of producing death." *People v. Blanks*, 361 Ill. App. 3d 400, 411 (2005). A gun is a *per se* deadly weapon. *Blanks*, 361 Ill. App. 3d at 411.

¶ 45    The defendant argues that the State did not prove beyond a reasonable doubt that he had the requisite intent to kill, and the attempt murder conviction should be reduced to aggravated battery. The defendant claims that no evidence demonstrated that he had expressed a specific intent to kill Jelks or anyone else during the shooting. Rather, the evidence was consistent with the defendant firing warning shots to prevent a physical brawl from occurring.

¶ 46    The defendant filed a motion to allow additional authority to cite *People v. Jackson*, 2023 IL App (1st) 200017-U. The motion was granted. In *Jackson*, the defendant argued that the circuit court erred in denying a request for a jury instruction on aggravated discharge of a firearm. *Jackson*, 2023 IL App (1st) 200017-U, ¶ 22. *Jackson* did not take issue with "the principle that an intent to kill can rationally be inferred from the act of shooting a gun at someone and the surrounding circumstances." *Jackson*, 2023 IL App (1st) 200017-U, ¶ 48. However, "the act of shooting toward someone does not automatically or necessarily compel a finding of specific intent to kill." *Jackson*, 2023 IL App (1st) 200017-U, ¶ 48.

¶ 47    In *People v. Barnes*, 364 Ill. App. 3d 888, 896 (2006), the defendant argued that no evidence was presented that he was aiming at the victim or had the intent to kill. However, firing several shots at the victim was sufficient to support an attempt murder conviction. *Barnes*, 364 Ill. App. 3d at 896. Similarly, in *People v. Green*, 339 Ill. App. 3d 443, 452 (2003), the act of shooting

at a group of police officers was sufficient to prove intent to support a conviction for attempt murder.

¶ 48    In this case, evidence was presented that a group of people confronted Jelks at her house to start a fight. Jelks called her mother about the confrontation. When Jelks's mother arrived, the driveway was blocked, and eight people were there, including a woman swinging a bat. Jelks, at first, assumed that the defendant wanted to diffuse the confrontation because he wanted to talk, but no conversation occurred. Instead, the defendant fired multiple shots at the person that the crowd came to fight, Jelks. She was taken to a nearby emergency room and required a blood transfusion. Dr. Nutakor testified that the victim's injuries were life-threatening.

¶ 49    The jury drew reasonable inferences from the evidence presented. The State proved beyond a reasonable doubt that the defendant had the specific intent to kill where he fired multiple gunshots at Jelks during a confrontation, and Jelks sustained life-threatening injuries from the multiple gunshot wounds.

¶ 50                              B. Waiver of Right to Counsel

¶ 51    The defendant claims the circuit court failed to ensure that the defendant effectively waived his right to counsel, and the defendant should have been re-admonished after an unlicensed individual, Sharon-Renee-Lloyd: Al, filed documents on the defendant's behalf. The defendant acknowledges that this issue was not preserved and seeks plain-error review.

¶ 52    A forfeited claim of error is reviewable under the plain-error rule where the error is clear or obvious and either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Albea*, 2017 IL App

17

(2d) 150598, ¶ 17. A waiver of counsel claim is reviewed under the plain-error rule because the right to counsel is fundamental. *People v. Jamison*, 2014 IL App (5th) 130150, ¶ 12. The State concedes that a denial of the right of self-representation is reviewable under the second prong of the plain-error rule. The State claims, however, that there was no error where the defendant knowingly, voluntarily, and intelligently waived his right to counsel, and multiple admonishments of the defendant were not necessary in this case.

¶ 53   The sixth amendment right to counsel implicitly provides for the right of self-representation in criminal proceedings. *Faretta v. California*, 422 U.S. 806, 821 (1975). The Illinois Constitution also guarantees an accused this right. *People v. Leeper*, 317 Ill. App. 3d 475, 480 (2000). "The determination of whether a defendant's constitutional rights have been violated is subject to *de novo* review." *Leeper*, 317 Ill. App. 3d at 480.

¶ 54   A defendant must knowingly and intelligently relinquish his right to counsel to represent himself. *Faretta*, 422 U.S. at 835. Waiver of counsel must be clear and unequivocal, and not ambiguous. *People v. Baez*, 241 Ill. 2d 44, 116 (2011). "The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances of that case, including the background, experience, and conduct of the accused." *Baez*, 241 Ill. 2d at 116. Additionally, "[t]he level of a defendant's competency as a lawyer is not a measure of his competency to waive counsel." *People v. Simpson*, 172 Ill. 2d 117, 137-38 (1996). A circuit court's determination regarding a defendant's waiver of counsel is reviewed for an abuse of discretion. *People v. Hui*, 2022 IL App (2d) 190846, ¶ 40.

¶ 55   The circuit court must substantially comply with Illinois Supreme Court Rule 401 (eff. July 1, 1984) for an effective waiver of counsel. *People v. Moore*, 2014 IL App (1st) 112592, ¶ 38. Illinois Supreme Court Rule 401(a) provides:

18

"(a) Waiver of Counsel. Any waiver of counsel shall be in open court. The court shall not permit a waiver of counsel by a person accused of an offense punishable by imprisonment without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:

(1) the nature of the charge;

(2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and

(3) that he has a right to counsel and, if he is indigent, to have counsel appointed for him by the court." Ill. S. Ct. R. 401(a) (eff. July 1, 1984).

¶ 56    The purpose of Rule 401 is to ensure that the defendant knowingly and intelligently made a waiver of counsel. *People v. Campbell*, 224 Ill. 2d 80, 84 (2006). "Strict, technical compliance with the rule is not always required; substantial compliance is sufficient for a valid waiver of counsel if the record shows that the waiver was made knowingly and intelligently and that the trial court's admonishment did not prejudice the defendant's rights." *Hui*, 2022 IL App (2d) 190846, ¶ 51. A reviewing court will look to the entire record in determining whether the defendant was properly admonished under Rule 401 and whether a particular waiver of counsel was knowing and voluntary. *People v. Ware*, 407 Ill. App. 3d 315 (2011).

¶ 57    During a pretrial conference, the defendant informed the circuit court that he had fired his attorneys. Defense counsel additionally informed the circuit court that the defendant wished to terminate counsel based on the belief that the laws of Illinois were not applicable. The defendant was advancing claims grounded in the sovereign citizen movement. See generally Southern Poverty Law Center, Sovereign Citizens Movement, available at https://www.splcenter.org/fighting-hate/extremist-files/ideology/sovereign-citizens-movement (last visited Feb. 22, 2024).

¶ 58    In *United States v. Jones*, 65 F.4th 926, 930 (7th Cir. 2023), the defendant "fired his trial counsel (at least in part) in order to make his sovereign-citizen defense that the [district] court lacked jurisdiction over him." (Internal quotation marks omitted.) In *Jones*, "Sharon Renee Lloyd" filed pleadings on the defendant's behalf and the defendant repeatedly stated that he "overstood" the court's admonishments regarding waiver of counsel. *Jones*, 65 F.4th at 931. The defendant believed that the government was holding him pursuant to "commercial jurisdiction" and to secure his release, the defendant filed "fraudulent financial documents that purported to settle unpaid debts." *Jones*, 65 F.4th at 928.

¶ 59    In *Jones*, the district court inquired what the defendant meant by responding "overstood" to the admonishments and the defendant indicated that it meant "being aware." *Jones*, 65 F.4th at 931. The district court determined that overstood meant "yes" and the defendant's decision was knowingly and voluntarily made. *Jones*, 65 F.4th at 931.

¶ 60    *Jones* additionally considered that "the Sixth Amendment protects the right of defendants to 'go down in flames if they wish.' " *Jones*, 65 F.4th at 930-931 (quoting *United States v. Reed*, 668 F.3d 978, 986 (8th Cir. 2012)). Thus, a defendant's sincere belief in the sovereign citizen movement alone, although "bizarre" and "reflect[s] [a] misunderstanding[ ] about criminal jurisdiction," does not prohibit defendants from representing themselves. *Jones*, 65 F.4th at 930.

¶ 61    The State additionally filed a motion to cite *People v. Slabon*, 2023 IL App (1st) 190265-U, as additional authority. In *Slabon*, the defendant made statements indicative of the sovereign citizen movement. *Slabon*, 2023 IL App (1st) 190265-U. *Slabon* found that "the simple fact that defendant refused to acknowledge his understanding when first admonished was not, in any way, an expression of confusion; it was just more gamesmanship by defendant that we will not reward." *Slabon*, 2023 IL App (1st) 190265-U, ¶ 45.

20

¶ 62     The defendant, in this case, used the same trial strategy to claim that he was not subject to the court's jurisdiction as in *Jones*. Additionally, the same non-attorney, Sharon-Renee-Lloyd: Al, filed documents on the defendant's behalf, and the defendant used the same language, "I overstand," during the Rule 401 admonishments.

¶ 63     The circuit court held a hearing to specifically address the defendant's unequivocal request to waive counsel. The circuit court explained each charge, the sentencing range for each of the charges, that an attorney could be appointed to represent the defendant, and the defendant would be given the opportunity to hire a different lawyer. Here, unlike *Jones*, the circuit court did not specifically question the defendant on what he meant by "overstand." The circuit court, however, after the defendant repeatedly responded with "overstand," summarized the admonishments by stating:

> "And knowing everything I just explained, the charges, the potential penalties, your constitutional right to be represented by a lawyer, you're telling me you want to represent yourself at this time, is that correct?"

The defendant responded, "I would like to represent my person in all caps."

¶ 64     The defendant's statement to represent his person "in all caps" does not deviate from the defendant's claim that he has knowingly and voluntarily waived his right to counsel. We note that the sovereign citizens movement uses nonsensical terms and language. According to the Southern Poverty Law Center, the use of a name in all capital letters, "JOHN ROBERT DOE, for instance, signifies the corporate shell of a person, as opposed to the flesh-and-blood person." See Southern Poverty Law Center, The Sovereign: A Dictionary of the Peculiar, available at https://www.splcenter.org/fighting-hate/intelligence-report/2010/sovereigns-dictionary-peculiar (last visited Feb. 22, 2024). Additionally, during the trial, the defendant emphasized punctuation in his name and documents filed by Sharon-Renee-Lloyd: Al, which included name punctuation.

21

According to the Southern Poverty Law Center, name punctuation has meaning, "John-Robert: Doe signifies a flesh-and-blood person named John-Robert of the family Doe, as opposed to a punctuation-free name, JOHN ROBERT DOE, which refers to the corporate shell of a person." See Southern Poverty Law Center, The Sovereign: A Dictionary of the Peculiar, available at https://www.splcenter.org/fighting-hate/intelligence-report/2010/sovereigns-dictionary-peculiar (last visited Feb. 22, 2024). Although courts have found that sovereign citizen movement arguments have "no conceivable validity in American law," there was a strategic purpose behind the defendant's actions. See *United States v. Schneider*, 910 F.2d 1569, 1570 (7th Cir. 1990); *People v. Bramwell*, 2022 IL App (2d) 200227-U, ¶ 13.

¶ 65    The defendant additionally claims that his pretrial actions and during the trial demonstrated that the defendant did not understand the circuit court's admonishments. Before jury selection, the defendant stated that he did not understand "the nature and cause of this action," and that he did not understand the offer made by the State. The defendant additionally did not understand the purpose of an opening statement, the jury instructions, and how the court had jurisdiction. Because he did not understand the proceedings, the defendant claims that he did not understand the admonishments when he waived his right to counsel.

¶ 66    When the defendant stated that he did not understand the proceedings before trial, the circuit court addressed the defendant's confusion. The circuit court gave the defendant the option to sever counts or stipulate to his prior conviction. The circuit court additionally explained the State's offer, the charges, and the sentencing range in response to the defendant's statement that he did not understand. The defendant's responses indicated that based on his sovereign citizen claim and trial strategy, he believed that the court did not have jurisdiction. The defendant's

22

statement that he did not understand why the case was moving forward when he did not "consent" to the proceedings was not related to his unequivocal request to proceed without counsel.

¶ 67    Before the sentencing hearing began on December 21, 2021, the circuit court addressed a notice of filing treason and genocide complaint made by Sharon-Renee-Lloyd: Al, which stated that she was a "Specific Power of Attorney-In-Fact." The circuit court found that Sharon-Renee-Lloyd: Al was not licensed in Illinois to practice law and refused to consider the filing. The circuit court asked the defendant if he wanted a lawyer before proceeding with the sentencing hearing. The defendant responded that he was "waiving all benefits of court."

¶ 68    The defendant additionally used the phrase, "*in propria persona sui juris*," during a status conference after documents were filed by Sharon-Renee-Lloyd: Al and during his closing argument. "*In propria persona*" stands for "*pro se*." See *Pro se*, Black's Law Dictionary (11th ed. 2019) (noting *pro se* is "[a]lso termed" *in propria persona*, *propria persona*, and *pro per*). "*Sui juris*" is Latin for "of one's own right; independent," meaning "of full age and capacity" or "possession full social and civil rights." See *sui juris*, Black's Law Dictionary (11th ed. 2019).

¶ 69    Upon review of the entirety of the record, the defendant maintained that he was representing himself, and he had not indicated that he wished to be represented by counsel. The defendant's responses appear to be gamesmanship and not confusion. The circuit court did not abuse its discretion in determining that the defendant knowingly and intelligently made a waiver of counsel after the defendant confirmed that he wanted to represent himself and after the defendant responded an understanding, that he "over[stood]" the admonishments.

¶ 70    The defendant additionally argues that the circuit court failed to substantially comply with Rule 401(a) where the circuit court misstated the maximum term of incarceration that could have been imposed. See Ill. S. Ct. R. 401(a) (eff. July 1, 1984). A defendant faces 25 years to natural

23

life in prison for a conviction of attempted murder if the defendant personally discharged a firearm that proximately caused great bodily harm. See 720 ILCS 5/8-4(c)(1)(D) (West 2020). The circuit court, however, stated that the maximum sentence for this offense was 55 years in prison for an attempt to commit first degree murder where the person personally discharged a firearm.

¶ 71 "[S]ubstantial compliance will be sufficient to effectuate a valid waiver if the record indicates that the waiver was made knowingly and voluntarily, and the admonishment the defendant received did not prejudice his rights." *People v. Wright*, 2017 IL 119561, ¶ 41. In *Wright*, the Illinois Supreme Court determined that the circuit court had substantially complied with Rule 401(a) where it had properly admonished the defendant in all respects, except for informing the defendant that he faced a maximum sentence of 60 years, when it was actually 75 years. *Wright*, 2017 IL 119561, ¶ 54. *Wright* determined that there was no basis to conclude that the defendant was prejudiced when the circuit court understated the possible maximum sentence. *Wright*, 2017 IL 119561, ¶ 56. Similarly, in *People v. Span*, the circuit court substantially complied with Rule 401(a) where the defendant "expressed his desire to represent himself at the beginning of the case and consistently reiterated that desire thereafter, even after being informed by the trial court of the potential pitfalls of doing so, and the defendant's stated reason for choosing self-representation did not hinge on the sentence for the charged offenses." *Span*, 2021 IL App (2d) 180966, ¶ 21.

¶ 72 Here, the defendant's reasoning for choosing self-representation was based on his sovereign citizen beliefs, and his belief did not depend on the nature of the charge of the possible sentence. The defendant's sentence additionally did not exceed the misstated sentencing range presented by the circuit court. The circuit court should have provided the correct admonishments

as to the actual maximum sentence. We, however, conclude that the circuit court substantially complied with Rule 401(a) where the defendant was not prejudiced by the misstatement.

¶ 73    The defendant additionally argues that the circuit court should have re-admonished the defendant when a non-attorney filed an appearance on his behalf and when the defendant asserted that he was misled by that same "outside source." The continuing waiver rule "provides that absent significantly changed circumstances or a later request for counsel, an intelligently and knowingly made waiver of counsel applies to all phases of trial." *Simpson*, 172 Ill. 2d at 138. Exceptions to the continuing waiver rule that necessitate an additional Rule 401 admonishment include a request by the defendant for counsel or circumstances that suggest the waiver of counsel was limited to a particular stage of the proceeding. *People v. Martin*, 2021 IL App (4th) 180267, ¶ 33. A lengthy delay between trial phases, newly discovered evidence, and new charges are circumstances that would require re-admonishment. *Simpson*, 172 Ill. 2d at 138.

¶ 74    There were no lengthy delays between trial phases, no newly discovered evidence, and no new charges were filed after the defendant waived his right to counsel. Additionally, the defendant never requested trial counsel to be appointed after his initial Rule 401(a) admonishment. The defendant's posttrial motion demonstrates that he took a position recommended by an "outside source" that did not work. Throughout the proceedings the defendant maintained that he was representing himself and he continued to advance the same defense. The defendant has not demonstrated a significant change in circumstances that would have required re-admonishment.

¶ 75                    C. Ineffective Assistance of Counsel

¶ 76    The defendant argues that he should receive a new trial due to *per se* ineffective assistance of counsel when Sharon-Renee-Lloyd: Al, who is not a licensed attorney in Illinois, filed pleadings

25

on the defendant's behalf. The defendant, alternatively, argues that this matter should be remanded for a hearing similar to a *Krankel* inquiry. See *People v. Krankel*, 102 Ill. 2d 181 (1984).

¶ 77 *Strickland* sets forth a two-part test for ineffectiveness of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A *Strickland* analysis of ineffective assistance of counsel is inappropriate where a defendant does not have a "duly licensed and qualified lawyer." (Internal quotation marks omitted.) *People v. Gamino*, 2012 IL App (1st) 101077, ¶ 16. "An individual not duly authorized to practice law cannot represent another in a court of law." *In re Estate of Mattson*, 2019 IL App (1st) 180805, ¶ 6; 705 ILCS 205/1 (West 2020). An attorney-in-fact or a layman is not a duly licensed and qualified lawyer. *Gamino*, 2012 IL App (1st) 101077, ¶ 16.

¶ 78 "A criminal defendant who is unknowingly represented by an individual who has been disbarred or suspended from the practice of law for any reason relating to lack of legal ability or moral character suffers a *per se* violation of his sixth amendment right to effective assistance of counsel." *Gamino*, 2012 IL App (1st) 101077, ¶ 22. Pleadings signed by an individual who is "not licensed to practice law in this State" have no legal effect. (Internal quotation marks omitted.) *People v. Wilson*, 2023 IL App (1st) 220032, ¶ 16.

¶ 79 The defendant requested to represent himself and maintained that he was representing himself during pretrial hearings, during the trial, and at the sentencing hearing. The circuit court refused documents signed by Sharon-Renee-Lloyd: Al that the defendant attempted to admit into evidence during trial. After the jury found the defendant guilty, Sharon-Renee-Lloyd: Al filed a notice of a treason and genocide complaint along with supporting documents. The circuit court investigated Sharon-Renee-Lloyd: Al's status as an attorney and discovered that she was not a licensed attorney in Illinois. The circuit court rejected her posttrial pleadings because she was not a licensed attorney.

26

¶ 80    When the circuit court rejected the posttrial pleadings filed by Sharon-Renee-Lloyd: Al, it inquired whether the defendant wished to continue to represent himself. The defendant maintained his jurisdiction argument and stated that he had waived all benefits of court. Thus, he continued to waive his right to counsel. The circuit court proceeded with the sentencing hearing immediately thereafter. We note that during the sentencing hearing, the defendant referred to Sharon-Renee-Lloyd: Al as his power of attorney and maintained that he was speaking on his own behalf. He additionally stated that he had the right to counsel and that Sharon-Renee-Lloyd: Al could act on his behalf because he was incarcerated. The defendant's request for appeal, however, referred to Sharon-Renee-Lloyd: Al as an "outside source." The defendant claimed to have "mistakenly waived his rights" because he believed that an "outside source was leading him in the right direction." The defendant never referred to Sharon-Renee-Lloyd: Al as a licensed attorney. Additionally, Sharon-Renee-Lloyd: Al never appeared in court on the defendant's behalf.

¶ 81    Pleadings signed by an individual who is not licensed to practice law have no legal effect. The circuit court properly refused the pleadings filed by a non-attorney. The defendant did not receive *per se* ineffective assistance of counsel where he maintained that he represented himself nor did he suffer a *per se* violation of his sixth amendment right to effective assistance of counsel based on filings by an "outside source" that were rejected by the circuit court.

¶ 82    Additionally, the *Krankel* inquiry was developed to address a *pro se* posttrial motion alleging ineffective assistance of counsel. *People v. Roddis*, 2020 IL 124352, ¶ 34. When a defendant makes a claim of ineffective assistance of counsel, the circuit court should first examine the factual basis of the claim. *Roddis*, 2020 IL 124352, ¶ 35. If the circuit court determines that the basis of the claim is a matter of trial strategy or if the claim lacks merit, then the motion may be denied. *Roddis*, 2020 IL 124352, ¶ 35. New counsel should be appointed if the allegations show

27

possible neglect of the case. *Roddis*, 2020 IL 124352, ¶ 35. The defendant appeared *pro se* and had not requested representation by counsel. *Krankel* does not apply.

¶ 83                                    D. Closing Arguments

¶ 84    The State's closing argument included the following statements:

> "This is the closing arguments. This is my chance to talk about the evidence we've heard and argue reasonable inferences that I think can be drawn from that evidence. I will start by saying it's probably reasonable to infer that [the defendant] did not shoot Paris Jelks because he was just so mad about Dyamond Gant being kicked out of Paris' house. That was just the catalyst that resulted in two antagonistic groups of people gathering together.

> What their prior antagonisms were we don't know, but clearly they were there when two car loads of people show up and have bats and there's fighting. And on top of that, we have this defendant carrying a gun illegally who based on what he said today does not believe the law applies to him, and that these courts do not have jurisdiction on him."

¶ 85    The defendant claims that the State committed misconduct during closing arguments where the State mischaracterized testimony and argued facts not in evidence by claiming a "prior antagonism." The defendant additionally claims that the State made an irrelevant argument related to the defendant's trial strategy and jurisdiction. The defendant failed to properly preserve this argument for review and seeks plain-error review.

¶ 86    "It is improper for a prosecutor to state his opinion as to the guilt or innocence of a defendant or to state facts not proved by the evidence, or otherwise get before the jury that which amounts to his own testimony." *People v. Bitakis*, 8 Ill. App. 3d 103, 108 (1972). The State may not present arguments that serve no purpose other than to inflame the jury. *People v. Blue*, 189 Ill. 2d 99, 127-28 (2000).

¶ 87    The State is entitled to argue "all reasonable inferences from the evidence." *People v. Nieves*, 193 Ill. 2d 513, 532-33 (2000). The State is also afforded great latitude in making closing

28

arguments. *Blue*, 189 Ill. 2d at 127. Arguments are viewed in their entirety. *Blue*, 189 Ill. 2d at 128.

¶ 88    "The regulation of the substance and style of the closing argument is within the trial court's discretion, and the trial court's determination of the propriety of the remarks will not be disturbed absent a clear abuse of discretion." (Internal quotation marks omitted.) *Blue*, 189 Ill. 2d at 128. If the State's closing argument contained error, then a *de novo* standard of review is applied to determine whether the error created substantial prejudice to the defendant, rendering the trial unfair. *People v. Taylor*, 2019 IL App (3d) 160708, ¶ 32.

¶ 89    In this case, reversal is unwarranted regardless of whether the State's remarks were improper. Overwhelming evidence was introduced at trial for the jury to determine that the defendant had the specific intent to kill Jelks. The defendant's guilt was substantial that a jury would have returned a guilty verdict even if the State had not commented that a prior antagonism was apparent based on the evidence that people went to Jelks's house to start a fight. The State's remarks during closing argument were not so prejudicial that it was impossible to determine whether the verdict of guilt resulted from these comments. See *Nieve*s, 193 Ill. 2d at 534. Additionally, the jury was properly instructed that the State's arguments were not evidence.

¶ 90    The defendant did not preserve this issue for review. The plain-error doctrine permits review to consider error that has been forfeited where "the evidence is close, regardless of the seriousness of the error," or "the error is serious, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Adams*, 2012 IL 111168, ¶ 21. The defendant has not met either prong of the plain-error test.

¶ 91    Jelks testified that the defendant shot her, and her mother additionally identified the defendant as the shooter. Jelks was shot three times in the abdomen during a confrontation and

suffered life-threatening injuries. The defendant's certified conviction of unlawful use of a weapon by a felon was also admitted into evidence. The evidence was not closely balanced, and the defendant did not meet the first prong of the plain-error rule.

¶ 92 The State's comments also did not amount to plain error under the second prong. The error was not "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence" (*Albea*, 2017 IL App (2d) 150598, ¶ 17). The State's comments do not constitute plain error.

¶ 93 E. Judicial Integrity and Cumulative Error

¶ 94 A defendant is entitled to a fair, orderly, and impartial trial, and a defendant's due process rights are guaranteed by the state and federal constitutions. *Blue*, 189 Ill. 2d at 138. The determination of whether a defendant's due process rights were violated is subject to *de novo* review. *People v. Williams*, 2013 IL App (1st) 111116, ¶ 75. "When a defendant's right to a fair trial has been denied, this court must take corrective action so that we may preserve the integrity of the judicial process." *Blue*, 189 Ill. 2d at 138.

¶ 95 A new trial may be granted on the ground of cumulative error where individual errors were not sufficiently egregious to grant a new trial but together created a pervasive pattern of unfair prejudice. *People v. Sims*, 2019 IL App (3d) 170417, ¶ 55. Generally, where there is no reversible error on any individual issue, there is no cumulative error. *Sims*, 2019 IL App (3d) 170417, ¶ 55.

¶ 96 The defendant argues that his convictions should be reversed and remanded for a new trial to uphold the integrity of the judicial system by allowing numerous errors and by displaying a deliberate indifference to the defendant's right to represent himself. The defendant argues that numerous errors resulted in cumulative error including that the circuit court deprived the defendant of a fair trial where the circuit court failed to ensure that the defendant's waiver of his counsel was

30

knowing, understanding, and voluntary; the circuit court failed to re-admonish the defendant of his right to counsel; the defendant received *per se* ineffective assistance of counsel when a non-attorney provided assistance; the State argued facts not in evidence during closing argument; and based on additional trial errors. Having determined that none of the errors alleged by the defendant constituted reversible error, or any error that may have occurred did not rise to the level of plain error, we find that the defendant is not entitled to a new trial.

¶ 97                                III. CONCLUSION

¶ 98     For the foregoing reasons, we affirm the judgment of the circuit court of Macon County.

¶ 99     Affirmed.

31